**GENEVA–ROTH, CAPITAL, INC. and Geneva–Roth Ventures, Inc., collectively d/b/a LoanPoint USA, and Mark Curry, Appellants–Defendants,**

v.

**Akeala EDWARDS, Appellee.**

**No. 49A02–1101–PL–43.**

Court of Appeals of Indiana.

Nov. 16, 2011.

Rehearing Denied Jan. 19, 2012.

James W. Riley, Jr., Riley Bennett & Egloff, LLP, Richard P. Cassetta, Bryan Cave LLP, Saint Louis, MO, Attorneys for Appellants, Geneva–Roth Ventures, Inc.

Irwin B. Levin, Richard E. Shevitz, Vess A. Miller, Cohen & Malad, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Geneva–Roth Ventures, Inc. d/b/a Loan-Point USA (LoanPoint USA) appeals from the trial court's denial of its Motion to Stay Proceedings and Compel Arbitration in a putative class action lawsuit filed by Akeala Edwards on behalf of herself and a purported class of Indiana residents who obtained small, short-term pay-day loans from LoanPoint USA. LoanPoint USA presents the following issue for our review: Did the trial court err in denying Loan-Point USA's motion to compel arbitration on the basis of impossibility of performance?

We affirm.[1]

On August 10, 2009, Edwards completed an on-line form application for a $300 pay-day loan from LoanPoint USA. At the time of her loan application, Edwards was presented with the entire loan agreement, which included an arbitration provision. The pertinent provision provided:

---

1. We heard oral argument in this case on September 28, 2011. We commend counsel on their written and oral advocacy.

Arbitration: Both parties agree that any claim, dispute, or controversy between us, any claim by either party against the other or the agents, services, or assigns of the other, including the validity of this agreement to arbitrate disputes as well as claims alleging fraud or misrepresentation shall be resolved by binding arbitration by and under the Code of Procedures of the National Arbitration Forum (NAF) at the time the claim is filed. Rules and form of the NAF may be obtained and all claims shall be filed at any NAF office on the World Wide Web at *www.arbforum.com* or at P.O. Box 50131, Minneapolis, MN 55405. Any arbitration hearing, if one is held, will take place at a location near Customer's residence. Customer's arbitration fees will be waived by the NAF in the event you cannot afford to pay them. This arbitration agreement is made pursuant to a transaction involving interstate commerce and shall be governed by the Federal Arbitration Act 9 USC Section 1–18. Judgment upon the award may be entered by any party in court having jurisdiction. Notice: Without this arbitration agreement, both parties have the right to litigate disputes through the law courts but we have agreed instead to resolve disputes through binding arbitration.

*Appellant's Appendix* at 22. Although Edwards claims that she did not sign a loan application, LoanPoint USA maintains that in order to complete the on-line loan application process, Edwards was required to click on a box next to the words "I agree" to indicate that she read, understood, and agreed to be bound by the terms of the loan agreement and that by typing her name in another box, she was electronically signing her name. Ultimately, Edwards's on-line loan application was approved, and LoanPoint USA deposited $300 into Edwards's bank account. Ten days later, LoanPoint USA deducted the first finance charge of $90 from Edwards's bank account and automatically renewed the loan. Over the course of the next ninety days, LoanPoint USA repeated this finance charge/renewal transaction eight more times, resulting in more than $700 in finance charges against Edwards while reducing the $300 loan balance by only $23.

On March 23, 2010, Edwards filed a complaint against LoanPoint USA, Geneva–Roth Capital, Inc., and Mark Curry in the Marion County Circuit Court, alleging that the loan agreement she entered into violated the Indiana Consumer Credit Code's Small Loans Act, *see* Ind.Code Ann. § 24–4.5–7–101 *et seq.* (West, Westlaw through 2011 1st Regular Sess.), and the Indiana Deceptive Consumer Sales Act, *see* Ind.Code Ann. § 24–5–0.5–1 *et seq.* (West, Westlaw through 2011 1st Regular Sess.).[2] On May 7, 2010, Edwards moved to certify the case as a class action.

On June 2, 2010, LoanPoint USA moved to stay the proceedings and compel Edwards to arbitrate her claim on an individual, not class, basis in accordance with the terms of the loan agreement.[3] The trial

---

**2.** The motion to compel arbitration and stay trial proceedings was filed solely by LoanPoint USA. With regard to the named defendants—Mark Curry and Geneva–Roth Capital, Inc., Edwards alleged in her complaint that Mark Curry is an owner and officer of Geneva–Roth Ventures, Inc., and Geneva–Roth Capital, Inc. She further alleged that Geneva–Roth Ventures, Inc., Geneva–Roth Capital, Inc., and Mark Curry operate as alter egos and as a single business enterprise in operating LoanPoint USA. Geneva–Roth Capital, Inc. and Mark Curry both filed motions to dismiss, including motions to dismiss for lack of personal jurisdiction. These motions remain pending before the trial court.

**3.** The matter of certification has not yet been decided by the trial court.

court permitted the parties to conduct discovery only as it related to the motion to compel arbitration and also set a briefing schedule for the parties to submit their arguments on the issue of arbitration. On September 28, 2010, Edwards filed her response to the motion to stay and compel arbitration, arguing, among other things, that the arbitration clause in her loan agreement with LoanPoint USA was invalid and unenforceable due to unconscionability and due to impossibility because the named arbitrator, the National Arbitration Forum (the NAF), was no longer available.[4] In response, LoanPoint USA urged the trial court to appoint an alternate arbitrator pursuant to 9 U.S.C.A. § 5 (Section 5) of the Federal Arbitration Act (FAA).[5]

On October 25, 2010, the trial court held a hearing on the motion to compel arbitration. On December 29, 2010, the trial court entered its ruling, concluding (1) that there was a valid agreement between Edwards and LoanPoint USA, (2) that the arbitration provision of the loan agreement was not unconscionable, but that (3) the arbitration provision contained within the loan agreement was "null and void as impossible to perform" because the forum selected to serve as the arbitrator of disputes (the NAF) is no longer available to serve in such capacity. *Appellant's Appendix* at 16. LoanPoint USA now brings this interlocutory appeal[6] challenging the trial court's conclusion that the arbitration provision in the LoanPoint USA contract fails due to impossibility and thus, the court could not appoint a replacement arbitrator pursuant to Section 5.

We review *de novo* a ruling on a motion to compel arbitration. *State ex rel. Carter v. Philip Morris Tobacco Co.*, 879 N.E.2d 1212 (Ind.Ct.App.2008), *trans. denied.* We apply ordinary contract principles to determine whether the parties have agreed to arbitrate a dispute. *Id.* In interpreting a contract, we give the language of the contract its plain and ordinary meaning. *Green Tree Servicing, LLC v. Brough*, 930 N.E.2d 1238 (Ind.Ct.App. 2010). The court should attempt to determine the intent of the parties at the time the contract was made by examining the language used to express their rights and duties. *Id.* "Indiana and federal law recognize a strong policy of favoring enforcement of arbitration agreements." *Safety Nat'l Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 1000 (Ind.Ct.App.2005), *trans. denied.* Thus, when construing arbitration agreements, every doubt is to be resolved in favor of arbitration. *Green Tree Servicing, LLC v. Brough*, 930 N.E.2d 1238. Parties are bound to arbitrate all matters that are not explicitly excluded and that

4. The Minnesota Attorney General filed a complaint against NAF alleging fraud and challenging NAF's suspect ties to the consumer loan and debt collection industries. On July 28, 2009, a Minnesota state court entered a consent judgment against NAF in which NAF agreed not to administer, process, or "[i]n any manner participate" in any arbitration of consumer disputes after July 24, 2009. *Appellee's Appendix* at 249. LoanPoint USA does not dispute that NAF is no longer available to arbitrate the current dispute.

5. The FAA applies to written arbitration provisions in contracts involving interstate commerce, 9 U.S.C.A. § 2, and creates a body of

substantive law applicable in both federal and state courts. *Brumley v. Commonwealth Bus. Coll. Educ. Corp.*, 945 N.E.2d 770 (Ind.Ct. App.2011) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)).

6. Ind. Trial Rule 14(D) provides that an interlocutory appeal may be taken as provided by statute. 9 U.S.C.A. § 16 permits an immediate appeal from an order refusing a stay under § 3 of the FAA or denying a petition under § 4 of the FAA to order arbitration to proceed pursuant to the terms of the loan agreement.

reasonably fit within the language used. *Id.*

■■■ Under Indiana contract law, the party seeking to compel arbitration has the burden of demonstrating there is an enforceable arbitration agreement and that the disputed matter is the type of claim the parties agreed to arbitrate. *Brumley v. Commonwealth Bus. Coll. Educ. Corp.*, 945 N.E.2d 770. After a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question. *Id.* State-law contract principles apply to determine whether parties have agreed to arbitrate. *Id.* Thus, like other contracts, arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, impossibility, or unconscionability. *See id.*

■■■ Here, we are concerned with the enforceability of the arbitration agreement and the court's authority to appoint a substitute arbitrator. Edwards argues, and the trial court concluded, that the arbitration agreement in the loan agreement is null and void because the named arbitrator, the NAF, is no longer available to conduct the arbitration.[7] On appeal, LoanPoint USA argues that despite the fact that the NAF is no longer available, Section 5 authorizes a court to select a substitute arbitrator.

With no Indiana cases to guide our decision, we look to recent decisions from other jurisdictions that have addressed the issue now before us—does an arbitration agreement fail due to impossibility if the chosen forum cannot serve as arbitrator or is the trial court obliged to appoint a substitute arbitrator in such case pursuant to Section 5? Sister jurisdictions have reached opposite results in deciding this question.

We begin by considering Section 5, which provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, *or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy,* then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

---

7. The trial court set forth its analysis as follows:

   The most significant feature of the [arbitration provision in the loan agreement] is that it identifies only NAF as the arbitrator. It does not provide a list of possible arbitrators or provide a procedure by which the parties nominate and strike proposed arbitrators. Furthermore, the use of NAF is mandatory in all respects. NAF forms must be utilized. Claims must be filed at the NAF offices. NAF chooses the individual arbitrator. NAF determines whether the claimant is entitled to have his fees waived. Finally, the dispute to be arbitrated "shall be resolved by binding arbitration by and under the Code of Procedures of the National Arbitration Forum." It appears to this Court that the choice of forum was not a logistical detail to which the parties were indifferent. The choice of forum shaped the arbitration in several important ways other than identifying who would make the decision.

   *Appellant's Appendix* at 12.

9 U.S.C. § 5 (emphasis supplied). Generally speaking, Section 5 permits a court to appoint a substitute arbitrator where the chosen arbitrator is unavailable. *Clerk v. First Bank of Del.*, 735 F.Supp.2d 170 (E.D.Pa.2010). Some courts have used Section 5 to uphold arbitration clauses where the chosen forum is unavailable. Other courts have held, however, that where the chosen arbitrator is "integral" to the arbitration provision but is not available to arbitrate the dispute, then the arbitration provision fails due to impossibility; in such case, Section 5 does not save the arbitration provision. *See id.* at 180.

In *In re Salomon Inc. Shareholders' Derivative Litig.*, 68 F.3d 554, 557 (2d Cir.1995), the Second Circuit addressed an arbitration provision that required all disputes be resolved by the New York Stock Exchange (N.Y.SE) "and only the NYSE, 'in accordance with the [NYSE] Constitution and Rules.' " The NYSE declined to arbitrate the dispute, and the defendants sought appointment of substitute arbitrators under Section 5, arguing another arbitrator could be appointed to arbitrate the dispute using the NYSE rules. Looking to the text of the arbitration agreement, the Second Circuit concluded "the parties had contractually agreed that *only* the NYSE could arbitrate any disputes." *Id.* at 559 (emphasis in original). The Second Circuit gleaned the parties' intent from the language used in the agreement and held that a trial court cannot use Section 5 "to circumvent the parties' designation of an exclusive arbitral forum." *Id.* at 561; *see also Grant v. Magnolia Manor–Greenwood, Inc.*, 383 S.C. 125, 678 S.E.2d 435, 438 (2009) (perceiving "great merit" in the Second Circuit's view that Section 5 does not apply in cases where a specifically

designated arbitrator becomes unavailable), *reh'g denied.* The court rejected the argument that the unavailability of the parties' named arbitration provider constituted "a lapse in the naming of an arbitrator" within the meaning of Section 5.[8] *Id.* at 561, 678 S.E.2d 435.

Following a similar analysis, the Illinois Supreme Court, in *Carr v. Gateway, Inc.*, 241 Ill.2d 15, 348 Ill.Dec. 374, 944 N.E.2d 327, 330 (2011), addressed the applicability of Section 5 where an arbitration agreement provided that the parties' disputes would be resolved " 'exclusively and finally by arbitration administered by the National Arbitration Forum (NAF) and conducted under its rules, except as otherwise provided . . .' " and that a penalty could be imposed against either party bringing a dispute in a forum other than NAF.

The *Carr* court agreed with federal courts that had held Section 5 "may be applied to name a substitute arbitrator where the parties' designated arbitral forum fails, unless the designation of the arbitral forum is *integral* to the parties' agreement to arbitrate." *Id.*, 348 Ill.Dec. 374, 944 N.E.2d at 333 (emphasis supplied). The *Carr* court acknowledged that "the mere fact parties name an arbitral service to handle arbitrations and specify rules to be applied does not, standing alone, make that designation integral to the agreement." *Id.*, 348 Ill.Dec. 374, 944 N.E.2d at 335. Indeed, "[w]here the designation of an arbitral forum is only an ancillary, logistical concern and the primary consideration is the intent to arbitrate disputes, allowing a court to appoint a substitute arbitrator fulfills the parties' agreement to arbitrate." *Id.*, 348 Ill.Dec. 374, 944 N.E.2d at 333. Clearly, "[s]ection

---

8. The Second Circuit found that "the lapse referred to in § 5 means a lapse in time in the naming of the arbitrator or in the filling of a vacancy on a panel of arbitrators or some other mechanical breakdown in the arbitrator selection process." *Id.* at 560 (internal quotation marks and citation omitted).

5 anticipates that a named arbitral forum may become unavailable and it provides a mechanism to appoint a substitute." [9] *Id.*, 348 Ill.Dec. 374, 944 N.E.2d at 335.

In reaching its conclusion, the *Carr* court surveyed several cases that had interpreted similar arbitration provisions. The court then considered the language of the arbitration provision before it and concluded that the language used by the parties in the arbitration clause (i.e., use of the word "exclusively") in conjunction with the penalty provision for failing to use the NAF as the arbitral forum, evidenced an intent that the designation of the NAF as the arbitral forum was integral to the agreement to arbitrate. The court thus held that Section 5 could not be utilized to select a substitute arbitrator.[10] Further supporting its conclusion, the court noted that given that Gateway drafted the agreement and presented the non-negotiable terms to Carr, Gateway demonstrated that it wanted to ensure that only the NAF would administer any arbitration that arose under the agreement.

In yet another case decided in July of this year, *Rivera v. Am. Gen. Fin. Servs., Inc.*, 150 N.M. 398, 259 P.3d 803 (2011), the New Mexico Supreme Court addressed an arbitration agreement that named the NAF as arbitrator and required that "AR-BITRATION WILL BE CONDUCTED PURSUANT TO THE RULES OF THE [NAF]." *Id.* at 807. An additional provision regarding arbitration stated: "[a]rbitration will be conducted under the rules and procedures of the [NAF] or successor organization." *Id.*

The *Rivera* court agreed with the "integral" versus "logistical concern test" finding that such was consistent with the state's general principles of contract law that require courts to give effect to the intention of the parties. Thus, in its analysis, the *Rivera* court focused on the language of the arbitration provision and noted that where it "evidences the parties' intention to resolve disputes solely through a specific arbitration provider, the parties' intent would be frustrated if a court appointed a different arbitration provider. The determinative issue is whether arbitration before the NAF is integral to the agreement to arbitrate." *Id.* at 812. The court noted that an express designation of a single arbitration provider weighs in favor of a finding that the designated provider is integral to the agreement to arbitrate.

With regard to the arbitration under consideration, the *Rivera* court held:

> The pervasive references to the NAF in the contract compel our conclusion that

---

**9.** The *Carr* court noted the potential for abuse brought about by parties using vague language in arbitration provisions to circumvent application of § 5.

**10.** Other jurisdictions have likewise applied the "integral" versus "ancillary logistical concern" test. *See, e.g., Ranzy v. Tijerina*, 393 Fed.Appx. 174 (5th Cir.2010) (looking to the plain language of the arbitration agreement to determine whether the parties intended for the NAF to be an integral part of contract); *Reddam v. KPMG LLP*, 457 F.3d 1054, 1061 (9th Cir.2006) (concluding that the naming of a particular arbitrator was not "so central to the arbitration agreement that the unavailability of that arbitrator brought the agreement

to an end"), *abrogated on other grounds as recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931 (9th Cir.2010); *Stewart v. GGNSC-Canonsburg, L.P.*, 9 A.3d 215, 221 (Pa.Super.Ct.2010) (concluding that "the plain language of the arbitration agreement [w]as the sole evidence of the parties' intent" and "delineat[ing] the NAF ... as the exclusive arbitrators"); *Grant v. Magnolia Manor–Greenwood, Inc.*, 678 S.E.2d at 439 (concluding that the parties' decision to submit to the rules of a particular arbitrator "reflects their specific intent to arbitrate *exclusively* before that body" when that arbitrator "may substantially affect the substantive outcome of the resolution").

the parties intended for the NAF to be the exclusive arbitrator in any out-of-court dispute resolution. The parties explicitly specified that arbitration would proceed under NAF rules and procedures. Arbitration "is a matter of consent, not coercion," and the parties "may ... specify by contract the rules under which that arbitration will be conducted." *Volt Info. [Sciences, Inc., v. Bd. of Trustees of the Leland Stanford Junior Univ.]*, 489 U.S. [468,] 479 [109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ]. We conclude that "[t]he unavailability of NAF as arbitrator ... threaten[s] to eviscerate the core of the parties' agreement." We hold that arbitration before the NAF was integral to the agreement to arbitrate and that § 5 of the FAA does not allow a court to select and impose on the contracting parties a substitute arbitrator inconsistent with the plain terms of their contract.

*Id.* at 815 (some citations omitted).

Other courts have taken a "less rigid" approach to answering the question of whether Section 5 permits a court to appoint a substitute arbitrator when the chosen arbitrator is unavailable and such has resulted in outcomes contrary to those previously discussed. *Id.* at 811. In *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217 (11th Cir.2000), the plaintiff, an employee of the defendant, filed suit after he was terminated from his position. The plaintiff's employment agreement, which he had signed, contained an arbitration clause stating that any dispute or claim "shall be resolved by binding arbitration under the Code of Procedure of the National Arbitration Forum." *Id.* at 1220. Upon motion by the defendant, the district court issued an order compelling arbitration. On appeal, the plaintiff argued that the arbitration clause was void because the chosen forum, the NAF, was no longer available to conduct consumer arbitrations. With little analysis, the *Brown* court re-

jected this argument, finding no evidence that the choice of the NAF was an integral part of the agreement to arbitrate. *See also Reddam v. KPMG LLP*, 457 F.3d at 1059 (holding that where arbitration agreement stated that arbitration "shall be determined pursuant to the rules" of a specified forum, the naming of a specified forum was not integral to the agreement to arbitrate); *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 742 F.Supp. 1359 (N.D.Ill.1990).

Mindful that federal and state policy favor arbitration as an alternate dispute resolution mechanism, we agree with the *Rivera* court's determination that the "integral" or "ancillary logistical concern" test is consistent with general principles of contract law requiring courts to give effect to the intent of the parties and that such approach "best complies with the admonition of the United States Supreme Court that a fundamental purpose of the FAA is to require that courts enforce arbitration agreements 'according to their terms.'" *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d at 812 (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. at 479, 109 S.Ct. 1248). We now apply this test to the arbitration agreement before us.

At a minimum, for the selection of an arbitrator to be "integral", the arbitration clause must include an express statement designating a specific arbitrator. *See Reddam v. KPMG LLP*, 457 F.3d at 1061. An express designation of a single arbitration provider weighs in favor of a finding that the designated provider is integral to the agreement to arbitrate. *Rivera v. Am. Gen. Fin. Servs., Inc.*, 150 N.M. 398, 259 P.3d 803.

As set forth above, the arbitration agreement between Edwards and Loan-Point USA expressly provided that "any claim, dispute, or controversy ... *shall* be

resolved by binding arbitration by and under the Code of Procedures of the National Arbitration Forum (NAF) at the time the claim is filed." *Appellant's Appendix* at 22 (emphasis supplied). The agreement further provided that rules and forms could be obtained from NAF and that all claims "*shall* be filed at any NAF office...." *Id.* (emphasis supplied). Under the terms of the arbitration provision, the NAF had authority to waive the customer's arbitration fees.

The arbitration provision in this case is similar to the arbitration provision addressed in *Ranzy v. Tijerina*, 393 Fed. Appx. 174 (5th Cir.2010). In that case, the *Ranzy* court was asked to consider an arbitration provision that stated:

> [A]ny and all claims ... *shall* be resolved by binding individual (and not class) arbitration by and under the Code of Procedure of the [NAF].... This agreement to arbitrate all disputes *shall* apply no matter by whom or against whom the claim is filed. Rules and forms of the NAF may be obtained and all claims *shall* be filed at any NAF office, [or by contacting the NAF via the internet, phone, or mail].

*Id.* at 175 (emphasis supplied in *Ranzy*). Taking specific note of the repeated use of the mandatory term "shall", the *Ranzy* court concluded that "the parties explicitly agreed that the NAF shall be the exclusive forum for arbitrating disputes." *Id.* at 176.

As in *Ranzy*, the language in the arbitration agreement before us clearly states that Edwards "shall" submit all claims to the NAF for arbitration and that the procedural rules of the NAF "shall" govern the arbitration. The express designation of the NAF as the arbitration provider in addition to the use of mandatory, as opposed to permissive, contractual language demonstrates that the parties intended that the NAF was integral to the arbitration agreement. *But see Adler v. Dell Inc.*, 2009 WL 4580739 at 4 (E.D.Mich. 2009) (finding that arbitration provision that stated any claim, dispute, or controversy between the parties "shall be resolved exclusively and finally by binding arbitration administered the [NAF]" was ambiguous as to the parties' intent in designating the NAF and ultimately holding that the unavailability of the NAF "should not frustrate the overriding intent to arbitrate"). Further supporting our conclusion is that by drafting the agreement and presenting the non-negotiable terms to Edwards, LoanPoint USA demonstrated that it wanted to ensure that only the NAF would administer any arbitration that arose under the agreement. *See Carr v. Gateway, Inc.*, 348 Ill.Dec. 374, 944 N.E.2d 327 (making same observation in further support of its conclusion that named arbitral forum was integral to arbitration provision).

Having concluded that the NAF as the arbitral forum was integral to the arbitration agreement, and given that the NAF is no longer available to conduct consumer arbitrations, the arbitration provision is null and void on grounds of impossibility. Section 5 does not save the arbitration provision and cannot be used as a mechanism to appoint a substitute arbitrator. The trial court did not err in denying LoanPoint USA's motion to compel arbitration.[11]

Judgment affirmed.

BAILEY, J., and BROWN, J., concur.

11. Having reached this conclusion, we need not address Edwards's argument that the trial court erred in finding the arbitration provision was not unconscionable.